UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INALFA ROOF SYSTEMS, INC.,
a Michigan corporation,

                                  Case

        Plaintiff,

v.                           Hon.

PNA MOLDING INC.,
a foreign corporation,

        Defendant.

---

## MOTION FOR
## TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

Plaintiff, INALFA ROOF SYSTEMS, INC. ("INALFA"), by and through its attorneys, ABBOTT NICHOLSON, P.C., pursuant to Fed. R. Civ. P. 65 and E.D. Mich. 65.1, moves this Court for (i) a Temporary Restraining Order, and (ii) an Order for Preliminary Injunction against Defendant PNA MOLDING INC. ("PNA") in connection with its refusal to supply INALFA with parts used by INALFA in the manufacture of roof systems installed in Ford, GM, and Stellantis (i.e. Chrysler) vehicles.

In support of this motion, INALFA submits the attached brief, including the Declaration of Thomas D. Tocco, and it also relies upon the Verified Complaint

(Docket No. 1). Pursuant to Fed. R. Civ. P. 65(b)(1) and E.D. Mich. 65.1, INALFA requests that a temporary restraining order be issued without notice as PNA has stopped supplying parts and, **if not resumed immediately**, INALFA will be forced to **shut down its assembly lines as follows: (i) Auburn Hills, Michigan on April 25, 2022, (ii) Cherokee, Georgia on April 26, 2022, and (iii) Mexico on May 4, 2022 (7-9 days required for shipment).** Therefore, INALFA has shown immediate and irreparable loss or damage will result before the adverse party can be heard in opposition.

INALFA, by the undersigned counsel, pursuant to Pursuant to Fed. R. Civ. P. 65(b)(1), certifies that it has not made an effort to give notice for (i) the reason stated above as to present assembly line shut down and (ii) counsel, on April 7, 2022, sent correspondence to counsel for PNA advising of breach and making a last effort to encourage supply of parts (see attached letter); however, that correspondence went without response or was otherwise disregarded.

WHEREFORE, Plaintiff INALFA ROOF SYSTEMS, INC. requests the following relief:

A.     That this Court issue a temporary restraining order and subsequent preliminary injunction maintaining the status quo and enjoining Defendant PNA, and all persons acting by, through, under, with PNA, from terminating, suspending, or otherwise refusing to supply parts and perform under the existing purchase

contracts between PNA and INALFA, including current pricing, for the manufacture of parts used by INALFA in its vehicle roof systems until further order of the Court;

     B.    The Temporary Restraining Order shall remain in full force and effect for a period of fourteen (14) days pursuant to Fed. R. Civ. P. 65.

     C.    Grant such further and additional relief as the Court considers appropriate in the circumstance.

Dated: April 22, 2022

Respectfully submitted,

ABBOTT NICHOLSON, P.C.

By:   /s/Daniel G. Kielczewski
Daniel G. Kielczewski (P42875)
Christopher R. Gura (P58437)
Attorneys for Plaintiff
1900 W. Big Beaver Road, Ste. 203
Troy, Michigan 48084
(313) 566-2500
dgkielczewski@abbottnicholson.com
crgura@abbottnicholson.com

4859-4531-7405, v. 1



JOHN F. YOUNGBLOOD
TIMOTHY J. KRAMER
ROBERT Y. WELLER II
SEAN A. FRASER
GEORGE M. MALIS
JOHN J. MORAN
CHRISTOPHER R. GURA
HEIDI E. WARREN
KRISTEN L. BAIARDI
STEPHEN C. JOHNSTON
ERIC R. WATSON

FOUNDERS
C. RICHARD ABBOTT
(1935-2003)
JOHN R. NICHOLSON
THOMAS R. QUILTER III
GENE J. ESSHAKI

SENIOR COUNSEL
DANIEL G. KIELCZEWSKI
RANDOLPH T. BARKER

OF COUNSEL
WILLIAM D. GILBRIDE, JR.
LORI A. BARKER
ROBERT G. LEWANDOWSKI
ALYSSA C. KENNEDY

MERITAS LAW FIRMS WORLDWIDE

1900 W. BIG BEAVER ROAD, SUITE 203
TROY, MICHIGAN 48084

TELEPHONE (313) 566-2500 • FACSIMILE (313) 566-2502
WWW.ABBOTTNICHOLSON.COM

April 7, 2022

**_VIA EMAIL_**

Ms. Nazish Agha
Agha & Agha LLP
7 Route 27, Suite 214
Edison, New Jersey 08820

      Re:    PNA Molding Inc. ("PNA")
             Various Supplied Components ("Parts")

Ms. Agha:

Please take notice that your client's refusal to ship product is a breach of contract and that Inalfa Roof Systems, Inc. ("Inalfa") is now within its rights to pursue any and all remedies against your client PNA including, without limitation, incidental and consequential damages. To the extent that you and/or PNA contend that there is no contract to breach, the contention is factually and legally without merit.  It is simply wrong.  We urge your reassessment of the situation.

In light of the foregoing, as to your email dated March 31, 2022, in which you assert the Uniform Commercial Code ("UCC") does not apply to the transaction at hand as there is no contract between PNA and Inalfa, consider the following: First, a contract does indeed exist between PNA and Inalfa based on the purchase orders issued by Inalfa and PNA's responsive action of acceptance by delivering parts, thereby creating a contract. MCL 440.2207. In addition, you will note that the Inalfa purchase order expressly adopts the Inalfa Terms and Conditions of Purchase (2009) ("Terms"), pursuant to which a contract was formed given PNA's delivery of goods.  Second, if a written contract did not exist, the UCC's purpose is to provide the needed structure to fill in the open terms, even to the extent of creating a contract where no written agreement exists. MCL 440.2207(3).  Of course, Inalfa contends that a written agreement does exist, therefore it is not necessary to rely on the UCC in this regard.

Addressing PNA demands, Inalfa, by way of correspondence dated on or about March 7, 2022, rejected PNA's unilateral price increase and requested adequate assurance of PNA's continued performance of the contract.  Any unilateral price increase is a breach of the Terms, which again are binding on PNA by virtue of the Purchase Orders and PNA's delivery of Parts.

ABBOTT NICHOLSON, P.C.

Ms. Nazish Agha                                    2                                    April 7, 2022

Indeed, a change in pricing cannot be imposed without Inalfa's agreement.   (See Terms, Section 9). The attempt to unilaterally increase prices is considered, without limitation, a basis for breach of contract.

Both the Terms and the UCC deny PNA's termination attempt.  Having been a selected supplier for the Parts, PNA is expected to continue to supply parts for the duration of the program.  Furthermore, and without conceding or approving the attempt to terminate, PNA's reliance on a 30-day termination notice is grossly unreasonable under the circumstances and denies Inalfa the ability to resource the work elsewhere in an orderly manner. See MCL 440.2309. The time needed to properly source the Parts is 18-24 months.

Given the above, and without prejudice to its claim of breach and its corresponding rights, Inalfa demands PNA's immediate reinstatement of performance to supply Parts. Compliance with the supply contract is strongly encouraged.

Very truly yours,

Sean A. Fraser

4880-0427-4714, v. 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INALFA ROOF SYSTEMS, INC.,
a Michigan corporation,

Case

Plaintiff,

v.                                                    Hon.

PNA MOLDING INC.,
a foreign corporation,

Defendant.

---

## BRIEF IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

Plaintiff INALFA ROOF SYSTEMS, INC. ("Inalfa"), in support of its

Motion for Temporary Restraining Order and Preliminary Injunction, states as

follows:

## INTRODUCTION

This motion seeks a temporary restraining order and a preliminary injunction

prohibiting Defendant PNA MOLDING INC. ("PNA"), and all persons acting by,

through, under, and with PNA, from terminating, suspending, or otherwise refusing

to supply parts and perform under the existing purchase contracts between PNA

and INALFA, including current pricing, for the manufacture of parts used by

INALFA in its vehicle roof systems until further order of the Court.  PNA has brazenly and without support under the law stopped shipping parts to Inalfa.  The parts are necessary in the manufacture of Inalfa roof systems that are installed in Ford Motor Company ("Ford"), General Motors Company ("GM"), and Stellantis N.V. (fka Fiat Chrysler Automobiles N.V. or "FCA") ("Stellantis") vehicles. Without the relief requested herein, the supply of the roof systems manufactured by Inalfa, given "just in time" supply chains, is exhausted thereby causing the shutdown of factory assembly lines and the massive and monetarily incalculable disruption of commerce.  Injunctive relief is most appropriate in the circumstance. Inalfa respectfully urges the Court to grant the requested relief.

## STATEMENT OF FACTS

Inalfa is a Michigan corporation that is a Tier 1 supplier in the automotive industry.  PNA is an Illinois corporation that has supplied Inalfa as a Tier 2 supplier in the automotive industry.

Beginning several years ago, Inalfa issued purchase orders (or "Price Books") to PNA for the purchase of certain parts used by Inalfa in manufacture of roof systems installed on vehicles manufactured by Ford, GM, and Stellantis. Copies of purchase orders issued to PNA are attached hereto as Exhibit A

(shipments to Inalfa Michigan plant), Exhibit B (shipments to Inalfa Georgia plant), and Exhibit C (shipments to Inalfa Mexico plant).[1]

The purchase orders issued by Inalfa to PNA incorporated the Inalfa Roof Systems Terms and Conditions of Purchase ("Terms") by reference.  A copy of the Terms is attached hereto as Exhibit D and it is incorporated herein by reference.

Upon receiving the purchase orders, PNA manufactured and shipped parts to Inalfa in satisfaction of the orders. By manufacturing and shipping parts to Inalfa, PNA entered into Purchase Contracts with Inalfa as defined by the Terms. Inalfa's orders are placed from its offices in Michigan.  PNA manufactures and ships parts from its facility in Illinois.

The Purchase Contracts between Inalfa and PNA are comprised of, without limitation, any purchase order, product releases issued under the purchases order, "Quality Criteria," the Terms, and other documents specifically incorporated into or made a part of the Purchase Contract by Inalfa. (Exhibit D, §1).

Pursuant to the Terms, a supplier warrants that it will supply parts to Inalfa for the life of the related program plus 15 years.  (Exhibit D, §16). Furthermore, a "[s]upplier agrees to continue to supply such parts as set forth in Inalfa's Purchase

---

[1] The purchase orders are a cumulative history of parts ordered from the supplier, including current part orders. Note that the date of the purchase order is the date of printing and not a date of the specific orders set out in the document.

Contract and written releases until the Purchase Contract is otherwise terminated by Inalfa." (Exhibit D, § 4.5).

Under the Terms, pricing for the parts are firm [§9.1], are not to "increase due to Supplier's costs increases" [§9.9], and that the supplier "assumes the risk of any event or cause (whether or not foreseen) affecting such prices" including "increases in raw material costs, inflation, increases in labor and other manufacturing costs" [§9.11]. (Exhibit D, §9).

Inalfa has issued releases to PNA for the manufacture and shipment of parts under the Purchase Contracts. Notwithstanding the releases and the Terms, on March 7, 2022, PNA notified Inalfa that it would cease the production and sale of parts sold to Inalfa unless price increases were accepted and paid by Inalfa. The subject parts are identified and highlighted in the attached purchase orders. (See Exhibits A, B, and C).

Upon PNA's notification that it would stop selling parts, Inalfa demanded adequate assurance of performance under MCL 440.2609 of the Uniform Commercial Code ("UCC") as adopted in Michigan. (Exhibit E). Inalfa also advised PNA that it is in breach of the Purchase Contracts and requested a reversal of its actions (see Exhibit F), but PNA has elected to remain in breach and will not manufacture and ship parts to Inalfa.  PNA has now stopped shipping parts.

(Exhibit G). Inalfa does not have any other vendor supplying the subject parts. (Exhibit G).

PNA's cessation of part production and delivery to Inalfa is a breach and will cause an imminent shutdown of the Inalfa production lines[2] and, shortly thereafter, the shutdown of the Ford, GM, and Stellantis vehicle assembly lines. PNA contends that there is not a contract and that the UCC is not applicable. Inalfa, however, argues otherwise that there is an existing contract between the parties pursuant to which PNA is to perform and the UCC is controlling to the extent terms are not stated in the contract.

As of this date, the parties' respective positions remain unchanged. PNA stopped shipments as of April 19, 2022. Given PNA's breach of the contract and continuing refusal to retract, Inalfa has been left with no alternative but to seek judicial assistance.

## STANDARD OF REVIEW

**Injunctive Relief under Rule 65**

Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of a temporary restraining order ("TRO"), including the ability to issue it without notice to the adverse party:

---

[2] (i) Auburn Hills, Michigan on April 25, 2022, (ii) Cherokee, Georgia on April 26, 2022, and (iii) Mexico on May 4, 2022 (7-9 days required for shipment).

(1) Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B)   the movant's attorney certifies in writing any efforts made to give notice the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

The Sixth Circuit has explained that the purpose of a TRO under Rule 65 is to preserve the status quo until the Court has had an opportunity to determine whether a preliminary injunction should issue. First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 650 (6th Cir. 1993).

In deciding whether to enter a TRO, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." Ohio Republican Party v. Brunner, 543 F.3d 357, 361 (6th Cir. 2008).  The four factors are not prerequisites that must be met but are interrelated concerns that must be balanced together. See Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006). For the first two factors, the probability of success on the merits that a plaintiff must show is inversely proportional to the degree of

irreparable harm that the plaintiff would suffer if a temporary restraining order is not issued. Id.

As the four factors are considered in the request for a TRO, they are also considered for a preliminary injunction request. CLT Logistics v. River W. Brands, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011)

## ARGUMENT

### 1. **INALFA will likely to prevail on the merits of its claims.**

A plaintiff must establish a likelihood of success for a court to issue a TRO or preliminary injunction. Inalfa can easily carry this burden.

As Inalfa's headquarters are in Michigan and this concerns transactions for goods, Michigan's version of Article 2 of the Uniform Commercial Code ("UCC"), Mich. Comp. Laws §§ 440.2101-.2725, governs this dispute. Grosse Pointe L. Firm, PC v. Jaguar Land Rover N. Am., LLC, 317 Mich. App. 395, 400, 894 N.W.2d 700 (2016) (citing Mich. Comp. Laws § 440.2102). The so-called "battle of the forms" provision of the UCC provides:

Sec. 2207.
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
      (a) the offer expressly limits acceptance to the terms of the offer;
      (b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

Mich. Comp. Laws § 440.2207. Under this section, there is a valid, binding, and enforceable contract between the parties given PNA's production and shipment of parts.  Further the contract (i.e. the Terms) provides that the law of Michigan (as the location of the issuing Inalfa office) is to be controlling in the relationship of the parties and the interpretation of the contract.  (Exhibit D, §31).

Under Michigan law, the interpretation of a contract is a question of law. Archambo v. Laws. Title Ins. Corp., 466 Mich. 402, 408, 646 N.W.2d 170 (2002). "The fundamental goal of contract interpretation is to determine and enforce the parties' intent by reading the agreement as a whole and applying the plain language used by the parties to reach their agreement." Dobbelaere v. Auto-Owners Ins. Co., 275 Mich. App. 527, 529, 740 N.W.2d 503 (2007). "If the language of the contract is unambiguous, we construe and enforce the contract as written." Quality Prod. & Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citation omitted).  PNA's contends that the supply relationship is without a contract and that it can unilaterally terminate sales to Inalfa. PNA's position is

without support under the facts and the law. Instead, the facts and the law support Inalfa's claims of breach of contract against PNA.

In this case, Inalfa years ago issued its offer to PNA for the purchase of the subject parts as purchase orders issued to Pullmann North America, Inc., as PNA was then known. The purchase orders incorporated Inalfa terms and conditions. (See Exhibit D, §2) ("The Supplier hereby agrees that the provisions of the Purchase Contract and the Term of purchase are the sole provisions applicable to the purchase of the goods and these provisions shall prevail over any additional or inconsistent terms contained or referred to in any communication at any time by the Supplier in whatever form.") Pullmann/PNA accepted the offer when it commenced the production of the parts and/or shipped the parts to Inalfa which actions constituted "a definite and seasonable expression of acceptance." See Mich. Comp. Laws § 440.2207(1). There being an offer and acceptance, the Terms, as included within the purchase orders, have governed the business relationship and, under the law, should be relied upon in disposing the disputed contract claim between the parties.

When considered, the Terms make it clear that Inalfa is very likely prevail on the merits of the case. The is a contract and the **contract does not permit PNA's unilateral termination** without recourse or other consequence. The clear and unambiguous Terms make it abundantly clear that PNA has agreed to

manufacture the goods for the life of the program plus 15 years.  (Exhibit D, §16).
PNA elected to enter into a supply contract with Inalfa that has generated parts
sales for many years, which has given PNA comfort in the knowledge that it has a
steady stream of business. In exchange, among other things, PNA committed to the
life of the part program and beyond, thereby giving Inalfa comfort and security in
the supply of necessary parts.

Contract law will not tolerate PNA's disregard for the Terms.  This factor
weighs in favor of Inalfa.

### 2.    <u>Inalfa will suffer irreparable injury without injunctive relief.</u>

"A showing of 'probable irreparable harm is the single most important
prerequisite' " to granting injunctive relief. <u>Lucero v. Detroit Pub. Sch.</u>, 160 F.
Supp. 2d 767, 801 (E.D. Mich. 2001) (quoting <u>Reuters Ltd. v. United Press Int'l,
Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990)). A party's harm is "irreparable" when it
cannot be adequately compensated by money damages. <u>Eberspaecher N. Am., Inc.
v. Van-Rob, Inc.</u>, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). For an injury to
constitute irreparable harm, it must also "be certain, great, and actual." <u>Lucero</u>, 160
F. Supp. 2d at 801 (citing <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C.
Cir. 1985)).

It is indisputable that Inalfa will suffer immediate and irreparable damage if
a TRO (and thereafter a preliminary injunction) is not issued preventing PNA from

refusing to fulfill its manufacturing obligation of the 41 parts needed by Inalfa. PNA has made it abundantly clear that it denies the existence of a contract and that it may terminate its production as it sees appropriate. Inalfa is now without supply of the parts essential to the manufacture of its roof system. The consequence is quite simple: Inalfa's assembly line will promptly shut down and, shortly thereafter, so too will the assembly lines of the vehicle manufacturers Ford, GM, and Stellantis. (Exhibit G) Inalfa manufactures the roof systems on a "just in time" basis. That is, Inalfa does not maintain a roof system inventory, but manufactures the roof system "just in time" to deliver it to the OEM manufacturers (i.e. Ford, GM, and Stellantis) for integration into the vehicle assembly process. Moreover, Inalfa does not have an alternate supply source or a bank of parts to keep its assembly line operating. (Exhibit G). The "just in time" supply chain is well known and conventional in the automotive industry. The damages for shutting down the OEM assembly lines are immeasurable. This is not a scare tactic or hyperbole. It is real. A TRO is absolutely warranted to maintain the status quo, including the continuing supply of parts by PNA to Inalfa under the governing contracts.

It is well known in this automotive intensive state that a cessation of shipments in the automobile industry can wreak havoc. See Intertek Sys., LLC v. Multimatic, Inc., No. 04–CV–73661–DT, at 6 (E.D.Mich.2004) (order granting

preliminary injunction), Dkt. # 8–2.  To promote efficiency, car manufacturers do not keep large reserve banks of parts.  "[C]omponent parts are often incorporated into a finished product within a few hours of their delivery." Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp., 749 F. Supp. 794, 798 (E.D. Mich. 1990). As a result, "[a] supplier's failure to make scheduled shipments may have immediate and dramatic consequences," Id. in that "any interruption in [a manufacturer's] production schedules might result in a shutdown of certain assembly lines while [it] obtained new suppliers and made the necessary arrangements for new production tooling and dies," In re Autostyle Plastics, Inc., 216 B.R. 784, 788 (Bankr. W.D. Mich. 1997), supplemented, 222 B.R. 812 (Bankr. W.D. Mich. 1998), aff'd, No. 1:98-CV-658, 1999 WL 1005647 (W.D. Mich. May 25, 1999), and order aff'd and remanded, No. 1:98-CV-658, 1999 WL 1005647 (W.D. Mich. May 25, 1999). These shutdowns, in turn, might cause the layoff of innumerable employees and a damage claim against the supplier along the order of millions of dollars a day. Id.; see also Gen. Motors Corp. v. Paramount Metal Prod. Co., 90 F. Supp. 2d 861, 875 (E.D. Mich. 2000).  This is precisely what will happen in the event that PNA is permitted to refuse supply of necessary parts for the Inalfa roof systems made for Ford, GM, and Stellantis vehicles. (see Exhibit G).

The "just-in-time" nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill

its obligations under contract. See Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc., No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012), vacated, No. 2:12-CV-11045, 2013 WL 12446240 (E.D. Mich. Apr. 9, 2013) ("the potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court.") Moreover, while a buyer may have the responsibility to "cover" in order to lessen its damages, see Mich. Comp. Laws § 440.2715(2), this typically refers to a buyer's ability to procure similar goods from a different distributor. In this case, due to the unique nature of PNA's products and the testing and certification requirements of Inalfa's customers, it would not be possible to secure alternate products from a different supplier. See TRW, Inc. v. Indus. Sys. Assocs., Inc., 47 F. App'x 400, 401 (6th Cir. 2002) (affirming preliminary injunction by district court based upon a finding of irreparable harm where automaker could not readily obtain air bags from another source and that plaintiff's goodwill and business reputation would be harmed absent injunctive relief.)

Failing a TRO and preliminary injunction, Inalfa will suffer irreparable injury. This factor weighs in favor of Inalfa.

3. **The failure to grant relief to Inalfa would cause substantial harm to others.**

This third prerequisite to injunctive relief requires the court to consider the harm to others should relief be granted. Considering this prerequisite, others will not be harmed if relief granted. Indeed, **the failure to grant relief to Inalfa will significantly harm others.** As noted above, the damage to Inalfa is catastrophic and irreparable. In contrast, if the injunction is granted, PNA will merely be expected to continue to perform under the contracts. It is simply inconceivable that the obligation to continue to perform on a contract could outweigh the shutdown of an assembly line as a measure of respective harms. Inalfa satisfies this requirement.

4. **The public interest favors granting Inalfa's motion.**

The public interest is substantially affected by the grant or denial of a TRO and preliminary injunction in this case. The public interest is best served by requiring parties to a contract to abide by their agreement. Superior Consulting Co. v. Walling, 851 F. Supp. 839, 848 (E.D. Mich. 1994), appeal dismissed and remanded sub nom. Superior Consultant Co. v. Walling, 48 F.3d 1219 (6th Cir. 1995). The public interest also weighs in favor of the efficient administration of the automotive industry. Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C., No. 08-CV-10558, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008) (holding that public interest factor weighed in favor of injunctive relief where compelling seller

14

to supply automotive part would avoid consequential plant shutdown or layoffs and would avoid economic harm to the state, region, and nation); *see also* <u>Almetals, Inc. v. Wickeder Westfalenstah L, GmbH</u>, No. 08-10109, 2008 WL 4791377, at *10 (E.D. Mich. Oct. 29, 2008) ("Denying the injunction places at risk the operations at Almetals, and, correspondingly, numerous customer assembly plants. This would be disastrous, irreparably damaging Almetals' business and reputation, and causing further detriment to the economy. Additionally, the public interest is served by requiring Wickeder to abide by its contractual agreement.") It would most certainly be contrary to the public interest to permit PNA to go rogue and walk away from a contract without support in the facts or law. That the contract might be too expensive to perform is not a good reason. The public interest cannot sanction the PNA's brazen disregard for contract law.  Based upon these significant public interests, this Court should grant the motion.

## CONCLUSION

For the reasons stated above, INALFA ROOF SYSTEMS, INC. requests the following relief:

A.     That this Court issue a TRO and preliminary injunction maintaining the status quo and enjoining Defendant PNA, and all persons acting by, through, under, with PNA, from terminating, suspending, or otherwise refusing to perform under the existing contract(s) between PNA and INALFA, including current

pricing, for the parts it has refused to manufacture for use by Inalfa in roof systems for Ford, GM, and Stellantis vehicles until further order of the Court; and

     B.    Grant such further and additional relief as the Court considers appropriate in the circumstance.

Dated: April 22, 2022

Respectfully submitted,

ABBOTT NICHOLSON, P.C.

By:   /s/Daniel G. Kielczewski
Daniel G. Kielczewski (P42875)
Christopher R. Gura (P58437)
Attorneys for Plaintiff
1900 W. Big Beaver Road, Ste. 203
Troy, Michigan 48084
(313) 566-2500
dgkielczewski@abbottnicholson.com
crgura@abbottnicholson.com

4886-1184-6941, v. 2